602 F.2d 670
 FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of the
Peoples State Savings Bank, Auburn, Michigan and as a
corporation organized and existing under the Laws of the
United States of America, Plaintiff-Appellant, Cross-Appellee,
v.
SUMNER FINANCIAL CORPORATION et al., Defendants-Appellees,
Cross-Appellants,
Assembly of Christian Benevolence, Inc., etc., et al.,
Defendants-Appellees.
 No. 76-2515.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 4, 1979.
 
 James M. McLean, Frank X. Friedman, Jr., Wayne E. Ripley, Jr., Jacksonville, Fla., for plaintiff-appellant.
 Sirote, Permutt, Friend, & Friedman, Birmingham, Ala., for Harris.
 James A. Harris, Jr., Birmingham, Ala., Charles P. Pillans, III, C. Harris Dittmar, Jacksonville, Fla., for defendants-appellees.
 Appeals from the United States District Court for the Middle District of Florida.
 Before BROWN, Chief Judge, TUTTLE and HILL, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 This case raises an interesting jurisdictional problem. In 1970, the Federal Deposit Insurance Corporation (FDIC), suing as the receiver of an insolvent Michigan state bank and as the subrogee of the rights of certain of the depositors, brought suit against the defendants alleging that they had conspired to fraudulently convert some $3 million of the bank's funds. Some two and one-half years later, near the end of the trial, counsel for FDIC announced that he had discovered a case that called into serious question the Court's subject matter jurisdiction.[1] The trial proceeded and the case was submitted to the jury, the District Judge announcing at the charge conference that he would let the case go to the jury and then hold a full hearing on the jurisdictional issues. After a verdict against defendants Sumner Financial Corporation (SFC), John Sumner, James Dondich, Frank Harris, and James McConnell had been returned, the Court dismissed the action for lack of subject matter jurisdiction. Alternatively, it granted judgment notwithstanding the verdict to SFC, Sumner, and McConnell.[2] FDIC appeals both rulings. Because we agree that the District Court lacked jurisdiction, we affirm the judgment of dismissal.
 
 Facts
 
 2
 The basic facts are complicated but not in dispute, at least not in their essentials. We set them forth only in such detail as is necessary to provide background for discussion of the jurisdictional issues.
 
 
 3
 The tale begins when in 1967 and 1968, the Peoples State Savings Bank of Auburn, Michigan made several loans totaling over $90,000 to Graham Alvey for the purpose of developing a "sportsman's paradise." The bank was a small one it had total resources of $10 million and capital and surplus of $450,000 so its exposure was considerable. As time went by and the Alvey loans were not being paid off, it became more and more apparent that unless Alvey obtained permanent financing and soon from another source, the bank and its President, Donald Pickelman, would be in deep trouble. Indeed, because of various subterfuges used in order to hide the precariousness of the loans from bank examiners and from his Board of Directors, Pickelman had good reason to fear criminal prosecution. Meanwhile, Alvey was on the verge of bankruptcy and his creditors were threatening to foreclose on his mortgage. By January of 1970, Alvey and Pickelman were desperate.
 
 
 4
 It was at this point that the defendants entered the picture. Defendants McConnell, an investment adviser, and Dondich, a broker, were acquainted with Sumner's method of "link financing."[3] Dondich knew defendant Harris, who had been involved in a previous attempt to obtain permanent financing for Alvey, and he knew as well that Alvey was seeking a new source of financing. He called Harris and told him that he had found a source of funds for Alvey namely, SFC.
 
 
 5
 Several meetings were held in the ensuing months. What emerged was an agreement whereby SFC was to arrange for the deposit of some $3 million in the bank. Fifty per-cent of the proceeds (less fees and expenses)[4] was to be loaned to Alvey, 25% To Harris, and 25% To Drake, a friend of Harris's. The money was to be deposited by individual investors, none of whom would deposit more than $20,000. The bank was to issue to each investor a "letter of credit" for the amount deposited, under the terms of which the investors would receive quarterly interest payments at a rate of 7% Per year. The letters of credit were to be issued for a term of two years, but SFC agreed to cause them to be renewed for a total period of 10 years. In addition to the interest, the investors were to receive an "incentive fee" from SFC.
 
 
 6
 To say that the handling of this transaction at the bank was somewhat irregular would be a considerable understatement. A spurious resolution of the bank's Board of Directors and a like opinion of counsel were prepared. The paperwork involved in receiving the deposits and issuing the letters of credit was done primarily in Pickelman's basement, and the records at the bank reflected neither that the bank had issued letters of credit, nor that the money had been received, nor that any loans had been made. The investors' checks were endorsed over to SFC as they came in, and SFC handled the disbursements. See note 4, Supra.
 
 
 7
 In April of 1970, FDIC and the state banking examiners learned by chance that the bank was issuing letters of credit. An investigation revealed that approximately.$2.3 million had been passed through the bank, that letters of credit obligating the bank in that amount had been issued, and that the borrowers had not executed notes for the loans nor put up any security. The bank was closed posthaste and FDIC was appointed as receiver.
 
 
 8
 Shortly thereafter, FDIC filed this suit for damages. In Counts I and II of the amended complaint, FDIC alleged that SFC, Sumner, Dondich, Harris, and McConnell had conspired to defraud the bank and to convert its funds. These counts were brought by FDIC in its capacity as receiver of the bank. In Count III, FDIC alleged that the defendants had defrauded the letter of credit holders.[5] This count was brought by FDIC in its capacity as insurer and claimed subrogation to the rights of the letter of credit holders as depositors.
 
 
 9
 Before trial, the District Court entered partial summary judgment in favor of the defendants on Count III. Because FDIC had not paid the letter of credit holders on their claims against the bank, the Court observed, it "cannot be subrogated to (their) claims . . . and lacks standing to assert (them) in this action."
 
 
 10
 FDIC offers five theories in support of jurisdiction over Counts I and II of the amended complaint: (1) federal question jurisdiction under 12 U.S.C.A. § 1819 (Fourth); (2) agency jurisdiction under 28 U.S.C.A. § 1345; (3) diversity jurisdiction under 28 U.S.C.A. § 1332 on the theory that the citizenship of FDIC for diversity purposes is the District of Columbia; (4) diversity again, on the theory that the citizenship of FDIC when suing as a receiver of a state bank is that of the state in which the bank is incorporated; (5) pendent jurisdiction by virtue of the federal claim pleaded in Count III.
 
 Federal Question
 
 11
 12 U.S.C.A. § 1819 provides, in pertinent part:
 
 
 12
 Upon the date of enactment of the Banking (Act of 1933), the Corporation shall become a body corporate and as such shall have power
 
 
 13
 Fourth. To sue and be sued, complain and defend, in any court of law or equity, State or Federal. All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy; and the Corporation may, without bond or security, remove any such action, suit, or proceeding from a State court to the United States district court for the district or division embracing the place where the same is pending by following any procedure for removal now or hereafter in effect, except that any such suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States.
 
 
 14
 Counts I and II of the amended complaint are brought by FDIC "in its capacity as receiver of a State bank" and involve "only the rights or obligations of depositors, creditors, stockholders and such State bank under State law." Whether these counts state a federal cause of action under § 1819 (Fourth) therefore depends upon whether the proviso in that section applies to original actions brought in the District Courts. A natural reading would indicate that it does. FDIC argues, however, that the proviso in § 1819 (Fourth) qualifies only that portion of the statute which it immediately precedes that dealing with removal. It relies on two Seventh Circuit cases interpreting the jurisdictional statute in the National Housing Act, 12 U.S.C.A. § 1730(k)(1), which provides for jurisdiction of actions in which the Federal Savings and Loan Insurance Corporation (FSLIC) is a party. See Katin v. Apollo Savings, 7 Cir., 1972, 460 F.2d 422, Cert. denied, 406 U.S. 918, 92 S.Ct. 1767, 32 L.Ed.2d 117; FSLIC v. Krueger, 7 Cir., 1970, 435 F.2d 633.[6]
 
 
 15
 For the Federal Savings and Loan Corporation, 12 U.S.C.A. § 1730(k)(1) provides,(k) Jurisdiction and enforcement. (1) Notwithstanding any other provision of law, (A) the Corporation shall be deemed to be an agency of the United States within the meaning of section 451 of title 28 (of the United States Code, 28 U.S.C.A. § 451); (B) any civil action, suit, or proceeding to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy; and (C) the Corporation may, without bond or security, remove any such action, suit, or proceeding from a State court to the United States district court for the district and division embracing the place where the same is pending by following any procedure for removal now or hereafter in effect: Provided, That any action, suit or proceeding to which the Corporation is a party in its capacity as conservator, receiver, or other legal custodian of an insured State-chartered institution and which involves only the rights or obligations of investors, creditors, stockholders, and such institution under State law shall not be deemed to arise under the laws of the United States.
 
 
 16
 In Krueger, the Seventh Circuit held that by virtue of clause (A) of § 1730(k) (1), the federal courts have original jurisdiction under 28 U.S.C.A. § 1345 of any suit brought by FSLIC. Section 1345 provides for original jurisdiction of all suits "commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." The Court disposed of the defendant's argument based on the proviso to § 1730(k)(1) as follows: "We are of the view . . . that subsections (B) and (C) of section 1730(k)(1), including the proviso, relate solely to removal proceedings from state courts in actions wherein the corporation has been made a party." 435 F.2d at 636. In Katin, the Court expressly reaffirmed Krueger.
 
 
 17
 The Ninth Circuit, while noting Krueger and Katin, has disagreed in part with their holdings. In Hancock Financial Corp. v. FSLIC, 9 Cir., 1974, 492 F.2d 1325, that Court held that clause (B) of § 1730(k)(1) was intended to constitute a grant of original jurisdiction in cases in which FSLIC is a party and that neither it nor the proviso "relate solely" to removal. The Court read the proviso as qualifying the grant of original jurisdiction and therefore held that a suit brought by the principal stockholder in a defunct savings and loan against FSLIC as receiver was not within the federal question jurisdiction.[7]
 
 
 18
 But we need not get involved in this controversy, if controversy it be. Whatever may be the case under § 1730(k)(1), it is clear from its history that the proviso in § 1819 (Fourth) qualifies the grant of original federal question jurisdiction contained therein as well as the provision concerning removal. This was surely true before the amending of § 1819 (Fourth) in 1966, for until then that section read:
 
 
 19
 . . . All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States: Provided, That any such suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States.[8]
 
 
 20
 The statute was amended to its present form by the Financial Institutions Supervisory Act of 1966, P.L. No. 89-695, 80 Stat. 1055 (1967). As a comparison of the old and revised version shows, the amendment dropped "(: Provided, That)" and inserted in its stead "(, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy; and the Corporation may, without bond or security, remove any such action, suit, or proceeding from a State court to the United States district court for the district or division embracing the place where the same is pending by following any procedure for removal now or hereafter in effect, except that)."
 
 
 21
 A search of the hearings, reports, and floor debates has turned up only two references to the amendment: identical one-sentence explanations from the Department of Treasury's section-by-section analysis of its original draft, See Financial Institutions Supervisory Act of 1966: Hearings on S. 3158 Before the Senate Comm. on Banking and Commerce, 89th Cong., 2d Sess. 319T (1966) (hereafter cited as Senate Hearings), and from the section-by-section analysis in the Senate committee report. See S.Rep.No.1482, 89th Cong., 2d Sess., Reprinted in (1966) U.S.Code Cong. & Admin.News, pp. 3532, 3359. That explanation states:
 
 
 22
 Section 205 (12 U.S.C.A. § 1819 (Fourth)) would vest the United States district courts, without regard to the amount in controversy, with original jurisdiction over any action to which the Corporation is a party and authorize the removal of such actions to the Federal courts.
 
 
 23
 We do not read this legislative history as indicating any intention to change the meaning of the prior statute such that the proviso would no longer qualify the grant of original jurisdiction. The proviso was left intact and there is no substantial evidence that Congress intended to alter its effect. Rather, we see the purposes of the amendment as limited to (i) eliminating any requirement of jurisdictional amount,[9] (ii) allowing FDIC to remove even though it is a plaintiff in the state court, see In Re Franklin National Bank Securities Litigation, 2 Cir., 1976, 532 F.2d 842, 844-45, and (iii) allowing FDIC as defendant in state court to remove even though other defendants do not consent to removal, see Id. at 846. Against reading the amendment more broadly stands the refrain repeated throughout the consideration of the Financial Institutions Supervisory Act that the Congress "did not wish to take any action which would do violence to the balance between State and Federal functions and responsibilities which underlies the dual banking system . . . ." S.Rep.No.1482, Supra, (1966) U.S.Code Cong. & Admin.News at 3538.
 
 
 24
 In fairness, although FDIC has not raised the argument, there is one piece of legislative history that could be seen as support for FDIC's position. As originally proposed and as passed by the Senate, § 1819 as amended read ". . . by following any procedure for removal now or hereafter in effect: Provided, That . . . ." See Senate Hearings, Supra, at 318; S. 3158. This was changed in the House Committee on Banking and Commerce to ". . . by following any procedure for removal now or hereafter in effect, except that . . . ." See H.Rep.No.2077, 89th Cong., 2d Sess. 3, 47 (1966). The House version was eventually enacted. On its face, this change, especially the substitution of a comma for a colon, might be taken to indicate an intention to have the proviso modify only that portion of the sentence following the semi-colon i. e., only that portion pertaining to removal. But if that was the intent, the drafters did their best to hide it: nowhere in the House Committee Report, the Conference Committee Report, Conf.Rep.No.2232, 89th Cong., 2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, p. 3532, or the floor debates is there any mention of an intent on the part of the House to effect a substantive revision of the Senate-passed bill in this respect. Rather, the change seems to have been treated as a mere editorial one. So viewed, this bit of legislative history does not detract from, but instead supports, our conclusion that the 89th Congress had no intention of revising the prior law. Under the amendment as originally drafted and as passed by the Senate, the meaning of which Congress apparently equated with the amendment eventually enacted, the proviso unambiguously qualified the grant of original jurisdiction.
 
 
 25
 Finally, our view that the § 1819 (Fourth) proviso qualifies the § 1819 (Fourth) grant of original jurisdiction is in accord with what appear to be the views of the Sixth Circuit, see FDIC v. Ashley, 6 Cir., 1978, 585 F.2d 157, 159, and the Fourth. See FDIC v. Godshall, 4 Cir., 1977, 558 F.2d 220, 222-23 (by implication).
 
 Agency And Diversity
 
 26
 28 U.S.C.A. § 1345 provides, in its entirety:
 
 
 27
 Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits, or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.
 
 
 28
 FDIC asserts that it is an "agency" within the meaning of § 1345, see Acron Investments, Inc. v. FSLIC, 9 Cir., 1966, 363 F.2d 236, Cert. denied, 385 U.S. 970, 87 S.Ct. 506, 17 L.Ed.2d 434; FDIC v. Abraham, E.D.La., 1977, 439 F.Supp. 1150, 1154, and the first sentence in § 1819 (Fourth) expressly authorizes FDIC to sue and be sued. Thus, FDIC argues, § 1345 gives jurisdiction over the causes of action asserted by it in Counts I and II of the complaint.
 
 
 29
 FDIC also invokes diversity jurisdiction under 28 U.S.C.A. § 1332, arguing that it, a federal corporation, is a resident of the District of Columbia, its principal place of business.[10] FDIC relies on both Garden Homes v. Mason, 1 Cir., 1956, 238 F.2d 654, which stated that the Federal Housing Administration is a resident of the District of Columbia for diversity purposes, and on the plain language of the 1958 amendment to § 1332(c), which provides that a corporation is to be considered a resident of the state of its principal place of business.
 
 
 30
 But while we think it probable that FDIC is an agency for purposes of Title 28 and possible that FDIC is a resident of the District of Columbia, we pretermit any definitive rulings on these issues because we believe that § 1819 (Fourth) should be read as a unified, integrated, self-contained whole i.e., that the grant of jurisdiction and the qualifying proviso are to be read as setting out a complete scheme for federal jurisdiction over cases in which FDIC is a party. It follows that the limitation on federal jurisdiction stated in the proviso cannot be evaded by predicating jurisdiction on some general jurisdictional grant.
 
 
 31
 At first blush, perhaps, this view might appear untenable: both the grant of jurisdiction and the proviso speak in terms of the "arising under" jurisdiction, whereas the basis for § 1345 jurisdiction is the "Controversies to which the United States shall be a Party" clause of Article III and that for diversity is the "Controversies . . . between Citizens of different States" clause. In other words, it might be argued that since the statute by its terms does not address agency or diversity jurisdiction, the proviso should not be read to preclude reliance on those heads of federal jurisdiction if properly invoked in a particular case. But we think that the structure, history, and purpose of § 1819 (Fourth) plainly demonstrate Congress' intention otherwise.
 
 
 32
 In the first place, the structure of § 1819 (Fourth) militates against giving too much emphasis to the fact that the proviso states only that suits within its description "shall not be deemed to arise under the laws of the United States" and does not specifically preclude agency or diversity jurisdiction. That structure is very simple. The statute announces first that every suit to which FDIC is a party arises under the laws of the United States and thus comes within the original jurisdiction of the district courts. This is a very expansive grant of jurisdiction, evidencing Congress' desire that cases involving FDIC should generally be heard and decided by the federal courts. Its only qualification comes in the proviso, and because the broad grant of jurisdiction is phrased in terms of "arising under," it is only natural that the sole qualification should be similarly phrased. The context thus strongly suggests that the proviso is to be read as stating an absolute limitation on federal jurisdiction over cases to which FDIC is a party.
 
 
 33
 Second, what legislative history there is supports the view that Congress thought of § 1819 (Fourth) as a self-contained scheme for jurisdiction over cases involving FDIC. The 74th Congress enacted the original version of the jurisdictional provisions in the statute. See Banking Act of 1935, P.L.No.74-305, § 101, 49 Stat. 692 (1935), quoted in text at note 8, Supra. The House Report on H.R. 7617, the bill which became the Banking Act of 1935, comments:
 
 
 34
 Under the provisions of (this statute), Federal courts have jurisdiction over suits to which the Corporation is a party where the amount in controversy exceeds $3,000, but an exception is made where the Corporation is a party in its capacity as receiver of a State bank.
 
 
 35
 H.Rep.No.742, 74th Cong., 1st Sess. 4 (1935). See also S.Rep.No.1007, 74th Cong., 1st Sess. 5 (1935). There is no evidence in either the House or Senate report that Congress thought federal jurisdiction could be predicated under any statute other than § 1819.[11] The exception was described without qualification, the inference being that it is to be applied without qualification. And the reference to the $3,000 jurisdictional minimum in the excerpt from the House Report just quoted suggests that Congress did not anticipate FDIC being able to invoke the United States as party jurisdiction the then-in-effect predecessor to § 1345 had no jurisdictional amount requirement. See Reconstruction Finance Corporation v. Krauss, D.N.J., 1935, 12 F.Supp. 44; H. Hart & H. Wechsler, The Federal Courts and the Federal System 1293-94 (2d ed. 1973).
 
 
 36
 But perhaps the most persuasive reason for interpreting § 1819 (Fourth) as setting out a self-contained jurisdictional scheme appears when one considers what eminent good sense § 1819 (Fourth) thus interpreted makes, as well as its consistency with the overall pattern of federal supervision of state banking systems. FDIC can operate in "two entirely separate and distinct capacities" in proceedings involving an insured state bank: (i) as a receiver of an insolvent bank, when "such appointment is tendered by the authority having supervision of such (state) bank and is authorized or permitted by State law," 12 U.S.C.A. § 1821(e); and (ii) in its corporate capacity as a federal insurer of bank deposits. See FDIC v. Abraham, E.D.La., 1977, 439 F.Supp. 1150, 1151. Each capacity is "designed to serve a different purpose and each is governed by an express statute." Abraham, supra, at 1151. When acting as the receiver of an insolvent state bank, FDIC possesses "all the rights, powers and privileges granted by State law to receiver of a State bank," 12 U.S.C.A. § 1821(e), and is to be treated exactly as any other receiver would be. This comports with Congress' general policy that the supervision and regulation of state banks are to be primarily the state's affair.[12]
 
 
 37
 Viewed from this vantage point, it is plain that what Congress has done in § 1819 (Fourth) is to set forth a discerning jurisdictional scheme that recognizes FDIC's dual role with respect to insured state banks by providing for federal jurisdiction in cases where FDIC is acting in its corporate capacity as federal insurer of state bank deposits, but expressly excluding jurisdiction in cases where FDIC is acting as receiver of a state bank and the case involves only state law issues. See Freeling v. Sebring, 10 Cir., 1961, 296 F.2d 244, 245. If agency or diversity jurisdiction were available to sustain jurisdiction in cases to which FDIC is a party even though the case comes within the proviso, this scheme would be destroyed and the proviso would be effectively read out of this statute: if agency jurisdiction were available, § 1345 would give jurisdiction over any suit brought by FDIC and § 1346 would give jurisdiction over any suit brought against FDIC, assuming sovereign immunity had been waived; if diversity jurisdiction were available on the basis of FDIC's citizenship being the District of Columbia, § 1332 would give jurisdiction over every suit brought by or against FDIC in its role as receiver of a state bank save those involving adverse District of Columbia residents. Moreover, the Congressional purpose implicit in the entire statute would be substantially, if not wholly, undermined, as federal courts would be deciding cases involving state law as applied to state banks solely because FDIC happened to be appointed receiver. We refuse to countenance this result, which is certainly not compelled, and will instead give full effect to Congress' intent by interpreting the proviso as stating an absolute preclusion of federal court jurisdiction.
 
 
 38
 We realize that the Seventh Circuit has reached a different result in two cases involving the FSLIC. See discussion of Krueger and Katin, supra. Without purporting to express any opinion on the reasoning or result of those cases, we emphasize that they are distinguishable. The jurisdictional statute there involved, 12 U.S.C.A. § 1730(k)(1), quoted Supra, expressly states in clause (A) that FSLIC "shall be deemed to be an agency of the United States within the meaning of section 451 (the definitional section) of Title 28." This statute was enacted as part of the Financial Institutions Supervisory Act of 1966. Before that enactment, there was no specific jurisdictional statute applicable to FSLIC. See Acron Investments, Inc. v. FSLIC, 9 Cir., 1966, 363 F.2d 236, Cert. denied, 385 U.S. 970, 87 S.Ct. 506, 17 L.Ed.2d 434. In commenting upon the addition of § 1730(k)(1), both the Department of Treasury in its section-by-section analysis of its draft bill, Senate Hearings, Supra, at 315M, and the Senate Banking and Commerce Committee in its section-by-section analysis, S.Rep.No.1482, Supra, (1966) U.S.Code Cong. & Admin.News at 3550, stated that "(t)he provisions of subsection (k)(1), with the exception of clause (A), therefore, are similar to existing law applicable to . . . the Federal Deposit Insurance Corporation (12 U.S.C. § 1819)." This difference between the two jurisdictional statutes and the fact Congress was undoubtedly aware of and apparently intended the difference may well justify reaching different results as to the ability of FDIC and FSLIC to invoke the agency jurisdiction. Indeed, that § 1819 (Fourth) was amended at the same time as § 1730(k)(1) was added and that Congress did not add a provision to § 1819 (Fourth) declaring FDIC's agency status for jurisdictional purposes as it did with FSLIC tends to support our holding that Congress did not intend FDIC to be able to invoke the agency jurisdiction and thus evade the § 1819 (Fourth) limitation on its federal court access when acting as the receiver of a state bank.
 
 
 39
 Finally, the Sixth Circuit apparently agrees with our conclusion that the proviso to § 1819 (Fourth) states a limitation on FDIC's ability to invoke federal jurisdiction despite its agency or citizenship status. In a case brought by FDIC against a state bank's directors and alleging corporate mismanagement and waste, that Court stated: "The only basis for federal court jurisdiction, which appellant FDIC did invoke, was a special statute governing the FDIC, 12 U.S.C. § 1819 (Fourth)." FDIC v. Ashley, 6 Cir., 1978, 585 F.2d 157, 159. Although the Court eventually found jurisdiction it held that the suit was brought by FDIC in its corporate capacity, not as receiver its entire discussion is founded on the assumption that there would have been no jurisdiction if, as the District Court had found, the suit had been brought by FDIC as receiver. See also FDIC v. Godshall, 4 Cir., 1976, 558 F.2d 220.
 
 Pendent Jurisdiction
 
 40
 In Count III of the amended complaint, FDIC sought to bring this suit not as the receiver of the allegedly defrauded state bank, but as the insurer of the letter of credit holders whose rights it would be subrogated to under 12 U.S.C.A. § 1821(g) when and if it paid off on their claims against the bank. As FDIC was suing in its capacity as insurer, the proviso to § 1819 (Fourth) was inapplicable and this count pleaded a federal claim under that section. Even if there is no independent basis for federal jurisdiction over Counts I and II, FDIC argues, the District Court had pendent jurisdiction over those Counts by virtue of the federal claim stated in Count III.
 
 
 41
 At the time the complaint was filed and at the time of trial, however, FDIC had not paid the letter of credit holders. A Michigan court had determined that the letters of credit were valid and binding obligations of the bank in October of 1971, but that judgment was on appeal and FDIC considered it improvident to pay the claims until that appeal had been concluded.[13] On December 11, 1972, about two months before trial began, the defendants moved for summary judgment. Regarding Count III, this motion argued (i) that FDIC had not paid the letter of credit holders and therefore was not subrogated to their claims, and (ii) that FDIC had no § 1821(g) subrogation rights against the defendants, as that section limits the subrogation rights of FDIC to "all rights of the depositor against the closed bank." On January 4, 1973, FDIC filed two responsive documents: a memorandum opposing summary judgment in which it disputed defendants' second argument, and a motion for dismissal without prejudice of Count III on the ground that "it appears, therefore, that since FDIC had not actually made payment as an insurer that it is not at this point subrogated to the rights of the Investors and, therefore, that Count III of the Complaint is premature." By order of January 16, 1973, the District Court granted partial summary judgment to the defendants. Citing the recitation in FDIC's January 4 motion that it had not paid the letter of credit holders, the Court held that "until such payment is made FDIC cannot be subrogated to the claims of the investors and lacks standing to assert those claims in this action." It therefore entered a take-nothing judgment against FDIC on Count III.[14]
 
 
 42
 Even though Count III was dismissed before trial, FDIC urges that that count stated a "not insubstantial" federal claim and thus supported the exercise of pendent jurisdiction over the state law claims asserted in Counts I and II. We cannot agree, for the federal claim stated in Count III was entirely without substance.
 
 
 43
 Considerable confusion has surrounded Count III throughout this litigation. The relevant portion reads:
 
 
 44
 In the event FDIC as an insurer pays the Investors the amount they invested in the letters of credit and until and if a determination is made by some court of competent jurisdiction that FDIC should not pay, FDIC is subrogated to the rights of the Investors as depositors against the Defendants pursuant to the provisions of 12 U.S.C. Section 1821(g).
 
 
 45
 This seems clear enough on its face. In its January 4 memorandum opposing the defendant's motion for summary judgment, however, FDIC stated that Count III was not based on § 1821(g) at all, as that section "in no way deals with those rights of depositors vis-a-vis third parties," but was instead grounded on its general equitable rights of subrogation.
 
 
 46
 On examination, this initial confusion turns out to be more of FDIC's own making than anything else. Section 1821(g) provides:
 
 
 47
 (g) Subrogation. In the case of a closed national bank or District bank the Corporation, upon the payment to any depositor as provided in subsection (f) of this section, shall be subrogated to all rights of the depositor against the closed bank to the extent of such payment. In the case of any other closed insured bank, the Corporation shall not make any payment to any depositor until the right of the Corporation to be subrogated to the rights of such depositor on the same basis as provided in the case of a closed national bank under this (Act) (12 U.S.C.A. §§ 1811 et seq.) shall have been recognized either by express provision of State law, by allowance of claims by the authority having supervision of such bank, by assignment of claims by depositors, or by any other effective method. . . . Provided further, That the rights of depositors and other creditors of any State bank shall be determined in accordance with the applicable provisions of State law.
 
 
 48
 As we read this section, the italicized proviso makes clear that in the case of a closed state bank, the rights of the depositors, and thus the rights of FDIC as subrogee, are to be determined under state law. See FDIC v. Wilhoit, Ed. Ky., 52 F.Supp. 308, Aff'd, 6 Cir., 1943, 143 F.2d 14. FDIC's invocation of § 1821(g) in Count III as the basis of its cause of action was therefore not inconsistent with its later statement that Count III was based upon its general equitable rights of subrogation.
 
 
 49
 A more serious confusion is due to the failure of FDIC to identify specifically what claims of the letter of credit holders against these defendants that it was seeking to assert as subrogee. We see only two possibilities: (1) the claims of the letter of credit holders based upon the alleged fraudulent conversion of the bank's funds; and (2) the claims of the letter of credit holders for breach of contract, for fraudulently inducing them to make deposits, or for misrepresentation as to the nature of their investment, its risk, or how it would be handled at the bank. Yet we think it unlikely that FDIC as subrogee can assert either of these claims.[15]
 
 
 50
 But even if this confusion were resolved favorably to FDIC, so that we could imagine a possible claim FDIC as subrogee could assert against these defendants once it paid the letter of credit holders, there would still be no basis for the cause of action asserted in Count III. Simply put, FDIC had not paid the letter of credit holders at the time the complaint was filed or at the time of trial, and as a general rule subrogation arises only when payment has been made. See 11 Appleman, Insurance Law and Practice § 6509, at 305-08. FDIC has advanced several arguments in an attempt to demonstrate that this general rule is not applicable here. None are persuasive.
 
 
 51
 FDIC argued to the District Court that "despite its failure to Become subrogated prior to the commencement of suit or the filing of the amended complaint, it Could have become subrogated prior to trial, and, thus, its claim was not insubstantial." (Emphasis in District Court's opinion.) This argument has the virtue of being arguably consistent with FDIC's January 4 motion to dismiss, since it stated in that motion only that Count III was "premature." But that is about its only virtue: as the District Court noted, to accept this argument "would be to countenance the filing of suit and the use of the judicial process before a claim comes to fruition" on the chance that the claim might materialize.
 
 
 52
 The argument FDIC has presented to this Court is somewhat different, but no better. It argues that while payment is generally a condition precedent to a subrogation action, equity courts have the power to grant a decree providing that upon payment, the surety will be subrogated. Thus, it is said, the District Court "could have" granted declaratory relief on Count III, despite the fact payment had not been made, liability was in doubt, and the complaint sought damages relief. This argument will not wash. Most of the cases in which such a decree has been entered have been litigations involving a number of competing parties where the Court was determining the rights and liabilities of the parties for the future and where there was a danger that the entry of a decree without such a protective provision would have seriously prejudiced the rights of the surety. See, e. g., In Re Penn Central Transportation Co., E.D.Pa., 1975, 402 F.Supp. 127, 138-39. That is quite a different matter from the situation presented here, where the surety plaintiff is Predicating its cause of action for damages on its rights as a possible subrogee if and when it makes payment on the insured's claim.
 
 
 53
 In these circumstances, we cannot say that the federal claim pleaded in Count III was in any sense a substantial one. There was nothing on which to hang pendent jurisdiction over the state law causes of action.
 
 Costs And Attorneys Fees
 
 54
 After trial and again after judgment, the defendants moved for an award of extraordinary costs and attorneys fees. The District Judge eventually denied the motion after a hearing, and the defendants cross-appeal.
 
 
 55
 As the basis for this claim, the defendants assert that FDIC brought and maintained this action in bad faith. They argue that FDIC knew, actually or constructively, that its jurisdictional allegations were baseless because it had successfully urged that federal jurisdiction was lacking in several cases similar to this one. See, e. g., FDIC v. National Surety Corp., S.D.Iowa, 1972, 345 F.Supp. 885, and cases cited therein. As support for an award of fees, defendants rely particularly on Basso v. Utah Power & Light Co., 10 Cir., 1974, 495 F.2d 906, which awarded attorneys fees against a party who had sandbagged by waiting to point out an obvious jurisdictional defect until after final judgment had been entered against it, and generally on such cases as Carter v. Noble, 5 Cir., 1976, 526 F.2d 677, and Exhibitors Poster Exchange v. National Screen Service Corp., 5 Cir., 1976, 543 F.2d 1106, Cert. denied, 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256, which upheld fee awards against litigants who had pursued frivolous and vexatious law suits.
 
 
 56
 We think, however, that the decision whether to award attorneys fees and extraordinary costs in a case such as this a case in which bad faith is not directly inferable from the record, compare Carter v. Noble, supra is committed to the informed discretion of the District Judge. And we cannot say that the District Judge abused that discretion in denying the defendants' motion.[16]
 
 Conclusion
 
 57
 In conclusion, we emphasize the narrowness of our holding today. We do not hold that FDIC is not an "agency." We do not hold that federal corporations are not citizens of any state or the District of Columbia for diversity purposes. Those questions must wait for another day. We hold merely that Congress made clear its intent in enacting § 1819 (Fourth) and has never indicated, either expressly or by implication, that it has abandoned the decision reflected there. We hold, in short, that by virtue of the proviso in § 1819 (Fourth), the federal courts do not have jurisdiction over suits brought by FDIC in its capacity as receiver of a state bank and which involve only the rights or obligations of the creditors, debtors, stockholders, and the state bank under state law.
 
 
 58
 AFFIRMED.
 
 
 59
 HILL, Circuit Judge.
 
 
 60
 I concur in the result.
 
 
 
 [1]
 The case was FDIC v. National Surety Corp., S.D.Iowa, 1972, 345 F.Supp. 885
 
 
 [2]
 The Court held that FDIC had failed to adduce sufficient evidence from which the jury could conclude that defendants SFC, Sumner, and McConnell had knowingly and willingly participated in a conspiracy to convert the bank's funds. We of course express no view as to the correctness of this ruling
 
 
 [3]
 The basics of Sumner's method of financing were explained in FDIC v. Sumner Financial Corp., M.D.Fla., 1974, 376 F.Supp. 772, on remand from 5 Cir., 1972, 451 F.2d 898:
 A typical transaction by SFC would proceed as follows: A bank with a customer to whom it is willing to make a loan does not have available cash funds to do so. The bank will tell the customer that, if he can have a substantial deposit put into the bank so that it will increase available cash, the bank will make him a loan of equivalent value. The customer is then in the market for some money and goes to SFC to request that Sumner make a placement of money in that bank, wherever it may be. The deposit requester will inform Sumner for what term the bank wants the deposit. He also will tell Sumner what interest rate the bank will pay on its certificates of deposit. Sumner then will set a fee with the deposit requester, which varies from 2% To 5% Of the deposit. For example, Sumner will say, "If the bank is going to pay 5% On one year certificates of deposit, for a fee of 4% From you, we will have our investors place a million dollars in that bank". The initial contact is invariably by the deposit requester to Sumner. The deposit requester is someone who needs money, is unable to acquire it alone, and has been led to SFC as a purveyor of money. The requester calls Sumner and orders the placement of money by completing an application that states: (1) who the customer is, (2) in what bank the customer wants the placement made, (3) the total amount of the deposit requested, and (4) the interest to be paid by the institution at maturity. The application also shows that there is to be an incentive fee paid to Sumner in addition to the interest which will be paid to the investor by the bank.
 Sumner then calls an officer of the bank named by the deposit requester and asks the bank if it will accept broker deposits. If the answer is yes, SFC asks what percentage of interest the bank is paying on time certificates for the term. Finally Sumner asks if the bank has any agreement with any deposit requester to hypothecate these deposits, or if these deposits are chargeable in any fashion for any transaction that the bank has with the customer. Sumner does not inquire into the transaction between its customer and the bank.
 At this point SFC begins to perform its function of acquiring deposits for the named bank. It contacts investors who consist of people around the country who have done business under the Sumner program before. SFC telephones an investor and tells him that deposits are needed in a particular bank in a particular state, that the bank will issue a six month certificate of deposit and pay a certain percentage return thereon, and that Sumner Financial Corporation will pay the investor an additional certain percentage to purchase a time certificate of deposit from that particular bank.
 Willing investors usually buy time certificates of $20,000.00 or less because one of the things Sumner has that makes its program attractive is the assurance to its investors that every bank has FDIC insurance.
 In that case, the District Court held that SFC had violated 12 C.F.R. § 329.8(g) (1973), which prohibits advertising, by any person who solicits deposits for an insured nonmember bank, a percentage yield greater than that authorized.
 
 
 [4]
 Some 37% Of the total amount deposited was to be used for fees and expenses. The agreed distribution of this money was as follows:
 
 
 [5]
 Whether this was the theory of Count III is something of a matter of conjecture. See discussion of the pendent jurisdiction claim Infra, at note 15
 
 
 [6]
 As will be apparent from the discussion below, both in this section and the next, we believe these cases are more supportive of FDIC's argument for agency jurisdiction under 28 U.S.C.A. § 1345 than for federal question under § 1819 (Fourth). But we discuss them here as well because FDIC has strenuously argued their relevance
 
 
 [7]
 It should be noted, however, that Hancock is not necessarily inconsistent with the results in Krueger and Katin : in Hancock, FSLIC was the defendant, and there was no claim of agency jurisdiction under 28 U.S.C.A. § 1345. Hancock therefore did not address the question whether FSLIC can sue as plaintiff under § 1345 when it is acting as receiver of a state savings and loan and the suit involves only the state law rights and obligations of the creditors, debtors, stockholders, and the state savings and loan
 
 
 [8]
 Banking Act of 1935, P.L. No. 74-305, § 101, 49 Stat. 684, 692 (1935)
 
 
 [9]
 Under the statute before it was amended, the jurisdictional amount requirement was applicable. The prior statute was not a grant of jurisdiction in and of itself, as it stated only that cases to which FDIC is a party "shall be deemed to arise under the laws of the United States." The statute granting jurisdiction, then, was that conferring jurisdiction over "arising under" cases, the general federal question statute, which contained a jurisdictional amount requirement. See H.Rep.No.742, 74th Cong., 1st Sess. 4 (1935), quoted Infra. The 1966 amendment changed this by adding to § 1819 (Fourth) ". . . and the United States shall have original jurisdiction thereof, without regard to the amount in controversy; . . ." This explains the Senate report's reference in its explanation of the bill to "vesting" the district courts with original jurisdiction, See S.Rep.No.1482, quoted Supra, and forecloses any argument that the comment is support for FDIC's theory that the proviso qualifies only the removal provision in the statute
 
 
 [10]
 As pointed out in the introduction, FDIC has also argued that when suing as the receiver of a state bank, it should be considered a resident of the state in which the bank is incorporated. Whatever the intrinsic merits of this argument, it is foreclosed by precedent. It is well-established that the citizenship of the receiver, not that of the party represented, governs for diversity purposes. See Smith v. Sperling, 1957, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205; Nunn v. Feltinton, 5 Cir., 1961, 294 F.2d 450, Cert. denied, 1962, 369 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784
 
 
 [11]
 This is not surprising. While it was of course well-established in 1935 that the federal courts could constitutionally exercise arising under jurisdiction over suits brought by or against federal corporations, see Osborn v. Bank of the United States, 1824, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204; Pacific Railroad Removal Cases, 1885, 115 U.S. 1, 5 S.Ct. 1113, 29 L.Ed. 319, it was by no means clear at that time that federal agencies could invoke the United States as party jurisdiction. The predecessor to § 1345 then in effect provided only for jurisdiction over suits brought by the United States or any officer thereof. The word "agency" was not inserted until the 1948 revision of the Judicial Code. See Reviser's Note to 28 U.S.C.A. § 1345, H.R.Rep.No.308, 80th Cong., 1st Sess. (1947): "Word 'agency' was inserted in order that this section shall apply to actions by agencies of the Government." And it was absolutely clear in 1935 that federal corporations could not invoke the diversity jurisdiction at that time federal corporations were not considered residents of any State or the District of Columbia for diversity purposes. See Banker's Trust Co. v. Texas & Pacific Ry., 1916, 241 U.S. 295, 36 S.Ct. 569, 60 L.Ed. 1010; Moore & Weckstein, Corporations and Diversity of Citizenship: A Supreme Court Fiction Revisited, 77 Harv.L.Rev. 1426, 1432-38 (1964). The 1935 Congress therefore had little reason to think heads of jurisdiction other than arising under were available, another reason not to place too much reliance on the fact that the proviso excludes only arising under jurisdiction and does not mention agency or diversity
 
 
 [12]
 See, e. g., the Senate Report on the Financial Institutions Supervisory Act of 1966, S.Rep.No.1482, 89th Cong., 2d Sess., Reprinted in (1966) U.S.Code Cong. & Admin.News, pp. 3532, 3538:
 The duties and powers of the Federal Reserve Board and the FDIC are broad and sweeping. They must be in order to carry out their functions. But neither they nor the State member and insured banks nor the State bank supervisors should ever forget for one moment that the State banks are chartered by the States, and are operated under State laws, and are responsible first and foremost to the officials of the States which created them.
 
 
 [13]
 The Michigan Court of Appeals affirmed after the trial in this case had been concluded. Petition of Briggs, 1974, 51 Mich.App. 421, 215 N.W.2d 722
 
 
 [14]
 We interpret this judgment as being without prejudice to the right of FDIC to sue as subrogee if and when it pays the letter of credit holders
 
 
 [15]
 The first possible claim does not in fact exist: the rule in Michigan, as elsewhere, is that depositors cannot maintain an action against third-parties who have defrauded a now-insolvent bank or converted its funds except possibly upon refusal of the receiver to pursue the action, as it is the "sole responsibility" of the receiver to proceed against them. See Petition of Briggs, 1974, 51 Mich.App. 421, 215 N.W.2d 722, 729; 9 C.J.S. Banks and Banking § 498. FDIC as receiver has vigorously pursued the claims of the bank against the defendants, and the letter of credit holders therefore have no right to bring an action against them on behalf of the bank. With respect to the second possible claim, FDIC as subrogee probably has no standing to assert the claims of the letter of credit holders against the defendants for fraud, misrepresentation, or breach of contract. FDIC is subrogated to the letter of credit holders' claims on the letter of credit, the deposit agreement between the investor and the bank it is that debt which FDIC insured and for which it is secondarily liable not to whatever claims for damages the letter of credit holders might have against third parties for fraud or misrepresentation, or for breach of any separate agreements between the letter of credit holders and the defendants. Such claims would necessarily be for the promised return on the investment, not for the amount invested FDIC would be obligated to pay the letter of credit holders claims (and thus would acquire subrogation rights upon payment) only if the deposit was, as promised by the defendants, a valid and binding obligation of the bank and thus insured. Indeed, FDIC apparently admits this, as Count III expressly states that FDIC "is subrogated to the rights of the Investors As depositors."
 
 
 [16]
 We therefore have no occasion to decide whether extraordinary costs and attorneys fees may be awarded against FDIC as an agency of the federal government