710 F.2d 1528
 AMERICAN NATIONAL BANK OF JACKSONVILLE, a national banking
association, Plaintiff-Appellee,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, etc., Defendant,
Sumner Financial Corporation, a Florida corporation,
Defendant-Appellant.
 No. 82-3069.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 4, 1983.
 
 C. Harris Dittmar, Charles P. Pillans, III, Timothy J. Corrigan, Jacksonville, Fla., for defendant-appellant.
 Michael J. Dewberry, Jacksonville, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before RONEY and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 
 1
 This case is an appeal from an interpleader action in the United States District Court for the Middle District of Florida. The defendant-appellant, Sumner Financial Corporation, appeals from the district court's ruling that the Federal Deposit Insurance Corporation, as receiver for the Peoples State Savings Bank, is entitled to recover $326,200 placed in escrow with the plaintiff-appellee, the American National Bank of Jacksonville. Because we find that the trial court correctly rejected Sumner Financial Corporation's challenges to the FDIC's entitlement to lay claim to the disputed funds and properly awarded the funds to the FDIC, we affirm.
 
 I. STATEMENT OF FACTS
 
 2
 In 1968, the Peoples State Savings Bank ("PSSB" or "the Bank") of Auburn, Michigan, became the subject of an examination by the Federal Deposit Insurance Corporation ("FDIC") and Michigan banking examiners due to the extremely high ratio of loans issued by the Bank to the Bank's deposits.[1] Of particular concern to the examiners and the PSSB board of directors were loans of approximately $90,000 to Graham Alvey and his wife. These loans exceeded both the line of credit approved for Alvey by the Bank's board of directors and the maximum loan the Bank was authorized to make to an individual under Michigan law. Donald Pickelman, the president of PSSB, was placed under considerable pressure to sever the Bank's relationship with Alvey or to raise the Bank's assets to a point which would support the excessive loans.
 
 
 3
 Alvey and some other PSSB customers who desired to borrow substantial additional amounts from the PSSB were placed in touch with John Sumner, president of Sumner Financial Corporation ("SFC") of Jacksonville, Florida. Since 1965, SFC had operated a "link financing" program whereby it placed time deposits in various banks in order to provide additional resources from which those banks could issue loans. At a series of subsequent meetings among PSSB officers, SFC representatives (including Sumner) and Alvey and other interested borrowers, a plan was formulated which operated as follows.[2]
 
 
 4
 SFC agreed to organize a group of investors who would purchase letters of credit from the PSSB in the aggregate amount of three million dollars.[3] The letters of credit provided for quarterly interest payments of seven percent per annum during the term of the letters and a final repayment of the amount invested. To encourage its investors to purchase these letters, SFC paid each investor an "incentive fee" which, when coupled with the interest payments, provided an attractive rate of return. The funds deposited by these letter of credit purchasers were to be immediately lent out to Alvey and the other borrowers. The amount invested by each investor was limited to $20,000, the maximum deposit insured by the FDIC, and the PSSB agreed that the investors' deposits would not be hypothecated, set off against or otherwise encumbered by the loans the Bank might make to a borrower.
 
 
 5
 SFC benefitted from the arrangement in two ways. First, the various PSSB borrowers who participated in the scheme (including the Alveys) agreed that twenty percent of the amount of the loans funded would be paid to SFC and SFC officials for their services. Second, the parties agreed that SFC would retain fourteen percent of the funded amounts to insure the quarterly interest payments due the investors; in the meantime, SFC benefitted from any earnings on these funds in excess of the amount it paid over to PSSB each quarter to cover the interest payments.
 
 
 6
 Checks received by the Bank from investors were not deposited to the account of the individual investors, but were endorsed "For deposit only to the account of Sumner Financial Corporation" and delivered to SFC in Jacksonville where they were deposited with the Florida National Bank. From there, SFC made the actual disbursements of money to the borrowers. After the Florida bank refused to accept further checks endorsed in that manner, SFC opened an account with the PSSB and ordered that the checks be deposited directly into that account. By April 13, 1970, SFC investors had placed $2,710,000 in the Bank, of which $2,330,000 had been loaned out to the borrowers. Fourteen percent of the latter amount, $326,200, had been retained by SFC for the funding of the PSSB's interest payments to investors; this amount, hereafter referred to as the "escrow fund," is the subject of this litigation.
 
 
 7
 On April 13, 1970, an FDIC examiner arrived at the Bank and commenced an examination of its records. Two days later, after discovering that the Bank was obligated to the letter of credit purchasers for $2,330,000 of disbursed funds for which it possessed no offsetting notes or securities from the borrowers, the FDIC ordered the Bank closed. On April 18, the FDIC was appointed as receiver of PSSB by a Michigan state court. The FDIC thus assumed its dual roles in the present action, as corporate insurer of the amounts on deposit at the PSSB at the time of its closing and as the receiver for the PSSB.
 
 
 8
 On or around April 18, Myers Fisher, assistant general counsel of the FDIC and head of the FDIC's closed bank liquidation section, received a telephone call at the PSSB receiver's office from Leon Holbrook, an attorney representing SFC and Sumner. During that conversation, Fisher requested that SFC return to the Bank the $326,200 that SFC was holding on behalf of its investors. Holbrook called Fisher back the next day and offered to return the money in exchange for a "release" from potential liability for SFC and Sumner. Fisher refused this offer.
 
 
 9
 Subsequently, on April 23, 1970, the FDIC, SFC and the American National Bank of Jacksonville ("ANB") executed the escrow agreement which is the subject of the dispute in the present action. The ANB, acting as escrow agent, agreed to hold the disputed $326,200 (with interest) until the FDIC and SFC filed a written agreement as to the proper disposition of the funds or until "a legal determination as to the ownership of the escrowed funds" by a "court of competent jurisdiction."
 
 
 10
 On June 15, 1970, the FDIC, in both its receiver and corporate capacities, filed a suit (hereafter referred to as the "damages action") against SFC and others in the United States District Court for the Middle District of Florida. In its receiver capacity, the FDIC sought recovery of the $2,330,000 converted from the PSSB as the result of a conspiracy among the defendants. In its corporate insurer capacity, the FDIC claimed entitlement to the escrow fund and also sought recovery of the $2,330,000 as subrogee to the rights of the insured depositors. During the course of the damages action, the FDIC never made any claim to the escrow fund in its receiver capacity.
 
 
 11
 On January 16, 1973, the trial court granted a partial summary judgment in favor of the defendants as to the FDIC's claim as corporate insurer on the grounds that the FDIC had not yet reimbursed the investors for their losses and thus possessed no subrogation rights to the disputed funds.[4] The damages action thus proceeded with the FDIC as plaintiff only in its receiver capacity.
 
 
 12
 The trial of the damages action lasted approximately five weeks. However, on March 1, 1973, just subsequent to the completion of the presentation of the evidence, the FDIC informed the court of a prior case, FDIC v. National Surety Corp., 345 F.Supp. 885 (S.D.Iowa 1972) in which the FDIC had successfully argued that there is a failure of subject matter jurisdiction where the FDIC brings suit solely in its receiver capacity. The National Surety case became the basis of a motion to dismiss by the defendants which the trial court deferred for post-trial disposition. The jury returned a verdict for the FDIC, but on July 20, 1976, the district court dismissed the case for want of subject matter jurisdiction. Alternatively, the court entered judgment notwithstanding the verdict in favor of SFC. On appeal by the FDIC, the former Fifth Circuit Court of Appeals affirmed the dismissal on the jurisdictional issue. FDIC v. Sumner Financial Corp., 602 F.2d 670 (5th Cir.1979).[5]
 
 
 13
 In 1972, the FDIC initiated an action in the Michigan receivership court requesting that the ANB be required to show cause why the escrow fund should not be delivered to the FDIC as receiver of the PSSB. The Michigan court entered the show cause order, and on September 19, 1974, the ANB responded to the order by initiating the present interpleader action in the U.S. District Court. On October 2, 1974, the federal district court granted SFC's motion to enjoin all parties to the interpleader action from prosecuting any proceeding in the Michigan receivership court related to the escrow fund. The federal court subsequently relieved the ANB of active participation in the interpleader action, leaving SFC and the FDIC to litigate entitlement to the escrow fund.
 
 
 14
 On December 26, 1974, the FDIC moved to dismiss the interpleader complaint alleging that the ANB had sued the FDIC in its capacity as insurer and not as receiver of the PSSB, the capacity in which the FDIC had executed the escrow agreement. On September 29, 1978, the district court denied the motion, finding that the ANB had properly sued the FDIC as receiver; the FDIC thereafter filed its answer to the interpleader complaint.
 
 
 15
 On June 25, 1982, the district court found that the FDIC, as receiver for the PSSB, was entitled to the escrow fund since the purpose of the original "link financing" agreement between the PSSB and SFC had been frustrated by the closing of the Bank and that the money should therefore revert to the original depositor of the funds, the PSSB. The court noted that SFC never claimed a "legal right" to the funds under the agreement, but merely acted as a "temporary holder" of the monies. In the alternative, the court ruled that SFC held the monies as a constructive trustee for PSSB.
 
 
 16
 In so ruling, the court rejected several challenges by SFC to the FDIC's right to claim the fund as receiver, holding that: (1) the FDIC executed the escrow agreement in its capacity as receiver of the Bank; (2) the FDIC as receiver was not barred from claiming entitlement to the escrow funds by virtue of its failure to do so in the prior damages action between SFC and the FDIC; and (3) the FDIC's claims under the escrow agreement were not barred by the statute of limitations.
 
 II. PROCEDURAL ISSUES
 
 17
 On appeal, SFC raises three grounds which it urges are sufficient to deprive the FDIC as receiver of the legal capacity to contest SFC's right to the escrow fund. Since the FDIC as receiver is the last possible adverse claimant to SFC's right of ownership,[6] a disqualification of the receiver would greatly facilitate SFC's efforts to acquire permanent possession of the fund. However, we are able to dispose of each of SFC's challenges and move on to a consideration of the merits of each party's claim of entitlement to the escrow fund.
 
 A. Capacity of the FDIC
 
 18
 SFC contends that the FDIC executed the escrow agreement in its corporate insurer capacity and thus has no right to make a claim to the escrow fund in its receiver capacity. The district court's factual finding that the FDIC executed the agreement in its receiver capacity may be overturned by this Court only if clearly erroneous. Fed.R.Civ.P. 52. Under this standard, the factual findings of a trial court must be allowed to stand unless the reviewing court is left with the definite and firm impression that a mistake has been made. Morgado v. Birmingham-Jefferson County Civil Defense Corp., 706 F.2d 1184 (11th Cir.1983).
 
 
 19
 SFC relies principally on the fact that the escrow agreement was executed by the FDIC, "a corporation under the laws of the United States of America" and was signed on the FDIC's behalf by John B. Chandler, Jr., as attorney for the "Federal Deposit Insurance Corporation." In so arguing, SFC relies on the statement of the Florida Supreme Court[7] in Luria v. Bank of Coral Gables, 106 Fla. 175, 142 So. 901 (Fla.1932) that a trustee can be held personally liable on a note he executed on behalf of the trust where
 
 
 20
 Neither the instruments themselves nor the signature showed that [the trustee] signed for or on behalf of anyone else ... Trustees and other fiduciaries may exempt themselves from personal responsibility by using explicit words to show such intention, but, in the absence of such words, they are held bound.
 
 
 21
 Id. 142 So. at 905. SFC also notes the analogous section of the Uniform Commercial Code which provides that a party who signs a note will be personally liable on the instrument "if the instrument neither names the person represented nor shows that the representative signed in a representative capacity." Fla.Stat.Ann. Sec. 673.403(2)(a).
 
 
 22
 We need, however, look no further than the introductory paragraphs of the escrow agreement to discover a clear expression of intent by the FDIC that it intended to execute the escrow agreement in its capacity as receiver for the PSSB. The recital portion of the agreement states:
 
 
 23
 WHEREAS, F.D.I.C. as receiver of the Peoples State Savings Bank, has made a claim against Sumner in the amount of Three Hundred And Twenty-Six Thousand, Two Hundred Dollars ($326,200.00); and
 
 
 24
 WHEREAS, Sumner has raised the question of whether F.D.I.C., or some other party, is entitled to the $326,200.00; and
 
 
 25
 WHEREAS, Sumner is unwilling to deliver the $326,200.00 to F.D.I.C. until said question has been resolved ...
 
 
 26
 (Emphasis added.) Though such recitals are not an operative part of a contract, courts have noted that such "whereas" clauses may provide definitive evidence of the intent of the parties, particularly where there is no language in the operative portion of the contract which conflicts with the intent expressed in the recitals. Union Pacific Railroad Co. v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 549 F.2d 114, 117 (9th Cir.1976); Henry G. Meigs, Inc. v. Empire Petroleum Co., 273 F.2d 424, 428 (7th Cir.1960); Kingwood Oil Co. v. Bell, 136 F.Supp. 229, 240 n. 15 (E.D.Ill.1955), aff'd 244 F.2d 115 (7th Cir.1957). It thus appears clearly stated on the face of the escrow agreement that FDIC was asserting its claim to the escrow fund and executing the escrow agreement in its capacity as the PSSB's representative. Absent evidence to the contrary, this evidence alone is certainly enough to prevent us from holding that the district court clearly erred in its assessment of the capacity in which the FDIC executed the escrow agreement.
 
 
 27
 Moreover, the extrinsic evidence of the events leading up to the formation of the escrow agreement lend additional support to the district court's conclusion. As previously noted, Leon Holbrook, the attorney for SFC, called the receiver's office at the Bank on or shortly after April 18 and spoke with Myers Fisher, an FDIC official who was administering the receiver's office. Holbrook and Fisher discussed the monies which were ultimately deposited in the escrow fund, and Holbrook agreed to return the fund in exchange for a release by the Bank from any potential liability to the Bank. Fisher, clearly speaking on behalf of the Bank, refused the offer, and the escrow agreement was executed by Holbrook and FDIC representatives just a few days later. The record is absolutely devoid of any evidence that the FDIC in its corporate capacity had expressed any claim to the $326,200 at any time prior to the execution of the agreement or that Holbrook had any doubt as to the receivership capacity of the FDIC when the agreement was executed.
 
 
 28
 In sum, the language of the agreement itself and the circumstances surrounding its formation lend substantial support to the district court's conclusion. As noted by the Florida Supreme Court in Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Finance Corp., 302 So.2d 404 (Fla.1974):
 
 
 29
 In the construction of written contracts, it is the duty of the court to place itself in the situation of the parties, and from the consideration of the surrounding circumstances, the occasion, and the apparent object to the parties, to determine the meaning and intent of the language employed.
 
 
 30
 Id. at 407. The district court has adequately applied this test to the evidence before it, and its determination must therefore be upheld.
 
 B. Judicial Estoppel
 
 31
 SFC notes that, except for the dismissal of the damages action for lack of jurisdiction, the FDIC as receiver would likely be barred by res judicata from asserting a claim to the escrow fund in the present case due to its failure to make such a claim in the damages action.[8] Since the FDIC brought the damages action in bad faith with full knowledge that the court there lacked subject matter jurisdiction, argues SFC, the FDIC should now be "judicially estopped" from relying on the dismissal of the prior action as a bar to the application of res judicata in favor of SFC.[9]
 
 
 32
 SFC's argument necessarily and correctly assumes the inapplicability of the res judicata bar to the present action. The earlier damages action, while arising out of the same transaction, was dismissed for lack of subject matter jurisdiction. Thus, no final judgment was entered on the merits of that action and res judicata may not apply to bar claims that were or should have been raised in that action. See Stone v. Maitland, 446 F.2d 83, 86 (5th Cir.1971); 1B Moore's Federal Practice p 0.405 ("ordinarily a judgment dismissing an action or otherwise denying relief for want of jurisdiction, venue, or related reasons does not preclude a subsequent action in a court of competent jurisdiction on the merits of the cause of action originally involved"). The district court properly found that the FDIC's failure to bring a claim for the escrow fund in the damages action is of no consequence here, where no judgment was entered on the merits in the earlier action. Thus, we need not decide whether appellant's claims in the instant action would have been barred by res judicata but for the dismissal of the damages action on jurisdictional grounds.
 
 
 33
 SFC reasons that the inapplicability of the doctrine of res judicata should be overlooked for essentially equitable reasons by this Court. As we understand SFC's claim, the FDIC exhibited bad faith by its delay in notifying the damages court of the National Surety case, an earlier federal case in which the FDIC urged that the court lacked subject matter jurisdiction under virtually identical facts. SFC suggests that the FDIC only brought the National Surety case to the attention of the court in the damages action in anticipation of an adverse judgment on the merits.
 
 
 34
 The legal and factual posture of the instant action does not commend it to the invocation of judicial estoppel. First, we are unable to concur in SFC's assertion of the FDIC's bad faith prosecution of the damages action. The former Fifth Circuit, in affirming the dismissal of that case, declined to grant attorney's fees to SFC, explicitly finding that "bad faith is not directly inferable from the record." Federal Deposit Insurance Corp. v. Sumner Financial Corp., 602 F.2d 670, 683 (5th Cir.1979). Our own review of the facts supports this binding determination. SFC did not abandon a sinking ship when it called the National Surety case to the damages court's attention; rather, the favorable jury verdict, which was set aside by the court in the damages action, indicates the FDIC's success in bringing its claims and interest in securing a final judgment on the merits. Moreover, the FDIC persistently opposed the motion to dismiss, both in the district court and on appeal.
 
 
 35
 The second reason for finding SFC's argument unavailing rests on the inappropriateness of the judicial estoppel doctrine to the instant situation. Judicial estoppel is applied to the calculated assertion of divergent sworn positions. See Johnson Service Co. v. TransAmerica Insurance Co., 485 F.2d 164, 174 (5th Cir.1973). The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings. These principles contributed to the district court's dismissal of the damages action where the FDIC was proceeding under the guise that jurisdiction was properly invoked, yet had earlier asserted in a similar situation that the courts lacked subject matter jurisdiction. The district court finally dismissed the damages action on jurisdictional grounds, thus preventing the assertion of the inconsistent position. See Sumner, 602 F.2d 670.
 
 
 36
 Where a court has essentially already applied judicial estoppel to correct an inconsistent position, and that amelioration has led to a dismissal of the suit for lack of jurisdiction, there is no longer any wrong to be mitigated by a court now handling the same cause of action under jurisdiction properly pled. We therefore see no reason to treat the prior damages proceeding as tantamount to a final judgment on the merits. No policy would be served by such treatment because the FDIC's inconsistent positions have already been rendered consistent and the FDIC's forthrightness in calling this inconsistency to the court's attention averted a subversion of justice.
 
 C. The Statute of Limitations
 
 37
 SFC argues that the FDIC as receiver is blocked by the applicable statute of limitations from asserting any claim in this action to the escrow fund. SFC advances this argument without any discussion of the date on which the statute of limitations commenced to run or of the particular statute of limitations applicable in the present action.
 
 
 38
 In any case, we need not consider these points since SFC waived its right to advance the statute of limitations defense by its failure to assert this affirmative defense in any pleading filed below in compliance with Fed.R.Civ.P. 8(c).[10] Jones v. Miles, 656 F.2d 103, 107 n. 7 (5th Cir., Unit B, 1981) ("an affirmative defense that is not asserted in a responsive pleading is generally deemed waived."); Funding Systems Leasing Corp. v. Pugh, 530 F.2d 91, 95 (5th Cir.1976) ("we look to the clearer principle embodied in Fed.R.Civ.P. 8(c) that affirmative defenses must be set forth in a responsive pleading or be deemed waived.").
 
 
 39
 SFC's contention that it raised the statute of limitations issue in the proceedings before the district court and that the FDIC's failure to object constituted implied consent to litigate the question under Fed.R.Civ.P. 15(b)[11] is unpersuasive. A review of the transcript from the proceedings below demonstrates clearly that SFC merely advanced the notion that the applicable statutes of limitations blocked all possible claimants to the escrow fund other than the parties to the case before the court.[12] Therefore, urged SFC in the court below, since the FDIC as receiver was neither a party to the escrow agreement nor had asserted any other valid claim to the escrow account, SFC was the only remaining entity which might possibly assert a valid claim to the escrow account and should thus be awarded the funds. The FDIC's silence during this argument, based no doubt on its concurrence with SFC's contention that all persons other than the parties to the interpleader action were barred from claiming the escrow fund by the statute of limitations, hardly constitutes consent to litigate the issue now raised by SFC. Though SFC's attorney, at the prodding of the trial court, did briefly touch on the applicability of the statute of limitations to the FDIC's claim (and the trial court subsequently discussed the issue in its Opinion and Order) the transcript makes clear that the trial court's consideration of this question was the product of the confused arguments of counsel for SFC, not of any clear discussion of the issue which might reasonably have placed the FDIC on notice that SFC was introducing the unpled issue into the case.[13]
 
 
 40
 Even assuming, for the purpose of argument, that SFC did not waive its right to present the statute of limitations bar as a defense, we would still concur in the decision of the district court that SFC's argument fails on the merits. The best possible case SFC could muster for applying a statute of limitations bar would be invocation of the shortest of the several statutes of limitations it suggests might apply, four years (Fla.Stat. Sec. 95.11 (1981)) to commence running immediately upon the FDIC's appointment as receiver on April 18, 1970. Even under this scenario, the FDIC's claim would not be barred.
 
 
 41
 The record clearly indicates that SFC is incorrect in asserting that the FDIC did not claim an entitlement to the escrow fund until February, 1979, in the Order on Final Pretrial Conference. On December 12, 1972, the FDIC petitioned the Michigan receivership court to issue an order directing the American National Bank to terminate the escrow agreement and to deliver the funds to FDIC, as receiver. This Petition resulted in an Order to Show Cause on September 10, 1974. Thus, the FDIC clearly asserted an entitlement to the escrow funds as receiver well within the permissible time under even the most stringent application of the statute of limitations bar.
 
 
 42
 The FDIC consistently pursued its claim as receiver to the escrow funds throughout the interpleader action. The FDIC's 1974 motion to dismiss the instant action was premised on its assertion of the right to the escrow funds as a receiver in the state action. Moreover, the pendency of the state action tolled any statute of limitations that arguably might otherwise be applicable to the instant federal interpleader action absent the state court suit. See Burnett v. New York Central Railroad Co., 380 U.S. 424, 85 S.Ct. 1050, 15 L.Ed.2d 941 (1965) (the commencement of a state court suit within the three year time limitations specifically imposed by the Federal Employers' Liability Act fulfilled the policies of repose and certainty inherent in the limitation provisions and tolled the running of this period); American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 36 L.Ed.2d 713 (1974). In addition, the date of the FDIC's answer is irrelevant to a determination of a statute of limitations bar where the need for an answer was delayed by action of the court itself in considering appellant's previous motion to dismiss.
 
 
 43
 We are fully satisfied, putting aside for the moment the complicated technicalities of the imposition and tolling of a statute of limitations bar, that SFC suffers no procedural injustice as a result of an adjudication on the merits of entitlement to the escrow funds. The Supreme Court has stated that the policies behind barring the claim of a plaintiff who "has slept on his rights," Burnett, 482 U.S. at 428, 85 S.Ct. at 1054, are:
 
 
 44
 designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.
 
 
 45
 Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 348-49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). These policies are not offended here, where the FDIC promptly pursued its demand for the escrow funds and consistently made that claim in both federal and state court. We also note that the escrow agreement itself should have put the appellee on notice of the FDIC's interest in securing the funds as receiver.[14] SFC's claim of surprise at FDIC's 1979 answer, in which the appellant again explicitly asserted its right to the funds as receiver, is therefore entirely unfounded.
 
 III. THE MERITS
 
 46
 A. Who gets the money?
 
 
 47
 Now that we have disposed of each of SFC's challenges to the FDIC's entitlement to claim the escrow fund in its capacity as receiver for the PSSB, we must settle the question which precipitated the formation of the escrow fund in the first place, as between SFC and the FDIC as receiver, which party is entitled to take final possession of the $326,200 in the escrow account? We do not doubt for a moment the propriety of the district court's determination that the FDIC has the superior equitable claim as between these two parties.
 
 
 48
 As noted by the district court, SFC was, at best, an unknowing participant in a scheme designed to defraud depositors, creditors and shareholders of the PSSB. Under the link financing agreement entered into by SFC, the PSSB and various other parties, SFC neither possessed nor claimed any ownership interest in the funds which eventually constituted the escrow fund, but merely held the money on behalf of the PSSB until such time as the interest payments were due the letter of credit investors. As previously noted, the plan then called for SFC to transfer the funds to the PSSB which, as obligor of the letters of credit, would make the interest payments to investors. SFC's claim on this appeal that the Bank acted merely as a "conduit" through which SFC made interest payments to the investors is absolutely contrary to the evidence.
 
 
 49
 It is well settled that the rights and liabilities of a bank and the bank's debtors and creditors are fixed at the declaration of the bank's insolvency. First Empire Bank v. FDIC, 572 F.2d 1361, 1367-68 (9th Cir.), cert. denied 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); FDIC v. Grella, 553 F.2d 258, 262 (2d Cir.1977); Kennedy v. Boston-Continental National Bank, 84 F.2d 592, 597 (1st Cir.1936), cert. denied 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937). SFC's attempt to rely on events subsequent to the Bank's closing in support of its claim of ownership to the escrow fund must fail since the rights of the parties were frozen on April 13, 1970, when the Bank's doors were shut to business.
 
 
 50
 In effect, the $326,200 held by SFC constituted an interest escrow account in the hands of SFC for the benefit of the PSSB and the letter of credit purchasers.[15] When the Bank ceased operations, the purpose of this "escrow account" lapsed and the money should have reverted to the depositor of the funds, the PSSB.[16] SFC's hands were further soiled when, shortly after the Bank's closing, SFC declined to return the funds to their rightful owner absent a release from liability.
 
 
 51
 We also concur with the district court in its alternative holding that SFC held the disputed funds as a constructive trustee for PSSB. SFC's contention that a constructive trust may be established only where the party against whom the trust is imposed has acquired the disputed property by fraudulent means is unavailing. In Tuturro v. Schmier, 374 So.2d 71 (Fla.D.C.A.3d 1979), quoting from the Florida Supreme Court's opinion in Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 422 (Fla.1927), the court stated:
 
 
 52
 A constructive trust is one raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it ... [E]quity will raise a constructive trust and compel restoration, where one through actual fraud, abuse of confidence reposed or accepted, or through other questionable means gains something for himself which in equity and good conscience he should not be permitted to hold.
 
 
 53
 374 So.2d at 73-74 (emphasis added).[17] When a constructive trust is created, the beneficiary (in this case, the PSSB) "is entitled to have his original interest restored, and to be reestablished in his title." Johnson v. Johnson, 349 So.2d 698, 699 (Fla.D.C.A. 4th 1977); see also, Allen v. Tatham, 56 So.2d 337, 340-41 (Fla.1952). This remedy follows as a matter of common sense since the purpose of the constructive trust is to prevent the unjust enrichment of the more culpable of the parties.
 
 
 54
 Since it has been determined by this Court that PSSB, as represented by its receiver, the FDIC, has the superior claim of entitlement to the escrow fund, it is therefore clear that the monies contained therein, together with the interest which has accrued since April 18, 1970, the date of the closing of the Bank, should be delivered over to the rightful owner, the FDIC.[18]
 
 
 55
 The judgment of the trial court is AFFIRMED.
 
 
 
 [1]
 On October 7, 1968, this ratio was approximately seventy-seven percent
 
 
 [2]
 Pickelman, PSSB's president, was apparently eager for Alvey to obtain a source of permanent financing since Alvey's bankruptcy was imminent otherwise. This bankruptcy would have had disastrous consequences for the Bank and perhaps even resulted in the criminal prosecution of Pickelman
 
 
 [3]
 These letters of credit were authorized by a fraudulent resolution of the PSSB board of directors and a spurious opinion letter by counsel. However, there is no evidence which suggests that Sumner was aware of the falsity of these documents
 
 
 [4]
 In 1974, the FDIC reimbursed the letter of credit investors a total of $2,963,440.52 after the Michigan Supreme Court refused to hear an appeal by PSSB shareholders from a ruling of the Michigan receivership court that the letters of credit were valid obligations of the Bank
 
 
 [5]
 The finding of lack of jurisdiction was based on 12 U.S.C. Sec. 1819 which provides that "Any suit to which the [FDIC] is a party in its capacity as a receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State laws shall not be deemed to arise under the laws of the United States." This statutory provision does not deprive the federal courts of jurisdiction in the present case because of the interest of the ANB in the outcome of these proceedings
 
 
 [6]
 All other possible adverse claimants arguably would be barred by the various statutes of limitations
 
 
 [7]
 The parties and this Court concur that this issue is best resolved by reference to the law of Florida. Though it is settled beyond question that Federal law governs cases involving the rights of the FDIC, D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 455, 62 S.Ct. 676, 678, 86 L.Ed. 956 (1942), courts must look to federal common law where, as in the present case, federal statutory law does not provide a rule of decision. In applying federal common law, "federal courts are free to apply the traditional common law technique of decision and to draw upon all the sources of common law ..." D'Oench, 315 U.S. at 472, 62 S.Ct. at 686 (Jackson, J., concurring). In the present case, we look to the law of Florida since the parties executed the escrow agreement in that State, and their reliance on Florida law in presenting this appeal demonstrates their intent to regulate and interpret the agreement under the laws of that State. See D'Oench, 315 U.S. at 474, 62 S.Ct. at 687 (Jackson, J., concurring) ("Many questions as to the liability of parties to commercial paper which comes into the hands of the [FDIC] will best be solved by applying the local law with reference to which the [parties] presumably contracted."); FDIC v. Meo, 505 F.2d 790, 793 n. 4 (9th Cir.1974) (California law applied when FDIC as receiver sued on promissory note executed in California with California bank); Riverside Park Realty Co. v. FDIC, 465 F.Supp. 305, 308-09 (M.D.Tenn.1978) (Tennessee law applied where realty in dispute located in Tennessee and parties stipulated in loan agreement that Tennessee law governed)
 
 
 [8]
 The FDIC did not seek return of the escrow fund in those portions of the complaint in the earlier damages proceeding which survived the granting of SFC's motion for partial summary judgment
 
 
 [9]
 There is some question as to whether SFC properly raised this judicial estoppel argument in the district court. It is clear that SFC did bring a res judicata and election of remedies defense but did not explicitly request judicial estoppel. SFC now argues that the judicial estoppel argument is so closely tied to the res judicata claim that raising one necessarily invokes the other. Because the judicial estoppel issue is not determinative, we assume without deciding that appellant's claim was properly raised in the court below to satisfy the requirements of Hall v. Board of School Commissioners of Mobile County, 681 F.2d 965, 970 (5th Cir.1981). We therefore proceed to consider this issue on the merits
 
 
 [10]
 Rule 8(c) provides
 Affirmative Defenses --In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.
 
 
 [11]
 Rule 15(b) provides:
 Amendments to conform to the evidence --When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
 
 
 [12]
 The applicability of the statute of limitations was only raised by SFC in its closing argument to the court. The pertinent portions of this argument are as follows:
 MR. DITTMAR [Attorney for SFC]: So we say that every possible claim that the FDIC as insurer, the FDIC as receiver, the borrowers, and the letter of credit holders could have made against Sumner Financial Corporation by reason of this transaction is now barred by the statute of limitations, and the parties can't do one thing to each other, except as the parties may claim under this escrow agreement and by reason of the terms of the escrow agreement.
 THE COURT: Let me interrupt you there if I may.
 MR. DITTMAR: Yes, sir.
 THE COURT: What statute of limitations do you have reference to?
 MR. DITTMAR: I have reference to the Michigan statute of limitations, as to the receiver. And I think it's significant. Is that what Your Honor is asking me? I think it's significant that Your Honor know this. And that is, that after Judge Tjoflat had held that this Court was without jurisdiction on the FDIC claim, we filed a motion with Judge Tjoflat seeking attorneys fees because of the wrongful action of FDIC in bringing us into this case in 1970, keeping us here until the fifth week of trial, at which time the FDIC lawyers disclosed that in a case that Mr. Myers Fisher was counsel in, Mr. Myers Fisher being the one who had signed this complaint originally, out West, the FDIC had successfully taken the position that the courts could not have jurisdiction, the federal courts could not have jurisdiction where the FDIC was the party as receiver.
 * * *
 THE COURT: Let me say this. I don't know that all of this is that important to your argument, but the statute of limitations--and you say you're relying on the Michigan statute of limitations. And if you would, address yourself to this--first, what was the statute and what was the time period for the statute of limitations? And when did that statute commence to run? And would it not have been tolled by the filing of this suit in 1974?
 MR. DITTMAR: I don't mind addressing myself to that, Your Honor. I'm not really as prepared as I'd like to be. Because what I'm urging Your Honor here to do is to make the determination based on the rights under the escrow agreement which would leave the parties, by reason of the fact that the other case went off on jurisdiction, subject to bringing such rights as they can against each other, and I say there are none. The applicable--
 THE COURT: One of your arguments is the statute of limitations; is it not.
 MR. DITTMAR: No, sir.
 THE COURT: You mean --
 MR. DITTMAR: No, sir. I'm saying if you find that nothing has happened under this escrow agreement which entitles the FDIC as insurer to receive the money, then it goes back to Sumner and all the parties then would be just like there never was an escrow agreement and they could have whatever claims they might be able to assert against each other. And that's why they are trying to come in under the escrow agreement.
 * * *
 THE COURT: Now, if we're suing on this escrow agreement, which was executed in June of 1970, or even the prior one of April 23, 1970, and they bring a suit in this court for damages which is ultimately dismissed for failure to establish subject matter jurisdiction, and at some point in that period a statute of limitations applies and cuts off their right to ever go after this fund again, I don't think that the suit which lacks subject matter jurisdiction would have tolled the running of the statute. And even though it was dismissed without prejudice, they couldn't come back in and commence another suit.
 So that's what I'm asking you. What statute are you talking about? When did it start running? When did the cause of action accrue to start the statute running? And was it not tolled by the filing of this suit by American National Bank in interpleading the money into this Court?
 MR. DITTMAR: Well, Your Honor, I believe that the applicable statute is section 600.5813 or the Michigan--it's MCL, Michigan Code of Laws, I guess it is.
 THE COURT: Okay.
 MR. DITTMAR: Or 600.5815, which sets a six-year statute of limitations, which is tolled only by the fraudulent concealment of the facts. Otherwise it starts running when the cause of action accrues. So there was not fraudulent concealment involved in this.
 THE COURT: Okay. Well, maybe--I apologize if I'm throwing you off on your argument. But all of this business commenced in early 1970?
 MR. DITTMAR: Correct.
 THE COURT: And this suit and FDIC's claim to the interpleaded funds commenced in 1974. Now, I would assume that would toll the statute of limitations by the filing of this suit and at least their making a claim in this suit to that fund within the six-year period.
 MR. DITTMAR: A claim under the escrow agreement, but exclusive of the escrow agreement. It would have to be a claim made under the escrow agreement which is--
 THE COURT: That claim was made within the six years.
 MR. DITTMAR: Well--
 THE COURT: Was it not?
 MR. DITTMAR: Judge, it's never been made as such. This case has gone on a long time and a lot has happened and some of my answers may not sound like they are sound answers.
 * * *
 MR. DITTMAR: And then, Your Honor, that motion to dismiss sat around here in this Court for some three or four years. On September 20, 1978, it was ruled on by Judge Carr, in which Judge Carr said--and I will get to his order in point of time--said, "it doesn't matter. I don't have to determine now whether you were receiver or insurer. The complaint is broad enough to bring you here in any capacity. And if you're here as receiver, I do have jurisdiction because the exclusion under 1819 is limited to very specific cases where you're sued as receiver and it involves only interest of stockholders and depositors." And that's not the situation here.
 Up to this point in time FDIC has not taken any position, you see. They haven't said what their claim is. And they didn't get around to it until after that order. And at the time the order came is when we have an answer filed by the FDIC in this case, filed--well, I may be wrong. It was filed October 19, 1978. And that's when they raised the contentions that this ought to be a constructive trust and the contention that if it was not a constructive trust, it was received by reason of the contractual transaction under which Sumner Financial Corporation was to hold the funds in escrow, and now we ought to get it back because that transaction has been frustrated. Or the third ground, which is sort of hard for me to grasp each time, which states that we ought to have it because Sumner is not entitled to it.
 Now, Judge--so, you see, it was not until 1978 that this claim was made that we are entitled to this by reason of these factors. And by that time the statute had run against the FDIC as receiver, and the lawyers representing the FDIC in this court had told Judge Tjoflat that the claim has run against us and there can't be any duplication of the trial that we have gone through. The Appellate Court will determine the thing, and that will be it.
 Now, all of that has been a little bit rambling and disorganized, and I apologize for that.
 (Emphasis added.)
 
 
 [13]
 Alternatively, we note that even if the attorney for SFC had clearly articulated the statute of limitations issue to the district court in its closing argument, Fed.R.Civ.P. 15(b) would not operate to hold that the FDIC has consented to the litigation of that issue since FDIC never had an opportunity to present evidence on the matter to the trial court. International Harvester Credit v. East Coast Truck, 547 F.2d 888, 890 (5th Cir.1977) ("an implied amendment of the pleadings will not be permitted where it results in substantial prejudice to a party 'i.e. whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory.' (citations omitted)")
 
 
 [14]
 See discussion, Section II.A., supra
 
 
 [15]
 Black's Law Dictionary defines "Escrow" as "A writing, deed, money, stock or other property delivered by the grantor, promissor or obligor into the hands of a third person, to be held by the latter until the happening of a contingency or performance of a condition, and then by him delivered to the grantee, promisee or obligee." See also Love v. Brown Development Co. of Michigan, 100 Fla. 1373, 131 So. 144, 146 (Fla.1930)
 
 
 [16]
 As noted in Corpus Juris Secundum:
 The grantor or obligor of an instrument, or the depositor of purchased money, held as in escrow, is entitled to its return when the other party fails to perform the conditions of the escrow contract, where the contingency specified has not occurred. It follows that on non-performance the depositary holds the instrument or other property for the benefit of the depositor, and if he fails or refuses to deliver the instrument or other property, he may be liable therefor to the depositor or his assigns. Even where the depositor has breached his agreement, he may recover the deposit from the depositary, if the obligee has lost or abandoned his right to the deposit or makes no claim to it. Likewise, the depositor is entitled to recover his deposit where it was made in connection with a proposed contract which was not consummated ...
 30A C.J.S. Escrow Sec. 12 at 1006-08. See also Tucker v. Dr. P. Phillips Co., 139 F.2d 601, 603 (5th Cir.1943) (title to money deposited in escrow passes to bankruptcy trustee upon bankruptcy of depositor subject only to lien expressly created by escrow agreement); Madden v. Parker, 292 So.2d 392, 394 (Fla.D.C.A. 1st 1974) (where no valid sales contract was executed, money deposited in escrow must be returned to the depositor).
 
 
 [17]
 See also Cannova v. Carran, 92 So.2d 614, 619 (Fla.1957); Circle Finance Co. v. Peacock, 399 So.2d 81, 85 (Fla.D.C.A. 1st 1981); Barnett Bank of Tallahassee v. Applegate, 379 So.2d 1284, 1287 (Fla.D.C.A. 1st 1977); Reaves v. Hembree, 330 So.2d 747, 749 (Fla.D.C.A. 1st 1976)
 
 
 [18]
 SFC's argument that it is equitably entitled to the interest accrued on the escrow account must fail since the FDIC had the right of possession and right of ownership to the money in the escrow account at all times subsequent to the Bank's closing